# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MIGUEL MOEDANO (M01039),** | ) | |
| **Petitioner,** | ) | **Case No. 11 C 6851** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **ANGELA WINSOR, Warden,** | ) | |
| **Big Muddy River Correctional Center,** | ) | |
| **Respondent.**[1] | ) | |

## MEMORANDUM OPINION AND ORDER

On September 29, 2005, R.T., a thirty year old female, visited Miguel Moedano, whom

she had met two nights earlier, at a restaurant where Moedano worked as a bartender.[2] R.T.

drank a portion of a margarita and two shots of tequila and began to feel "weird." After

Moedano's shift ended, R.T. and Moedano went to two other bars and, after stopping at

Moedano's apartment, eventually ended up at R.T.'s apartment, where she repeatedly threw up.

As she lapsed in and out of consciousness, she realized that Moedano was engaging in sexual

activity with her. Following a bench trial in the Circuit Court of Cook County, Moedano was

convicted of sexually assaulting R.T. while knowing she was unable to consent and was

sentenced to two consecutive terms of five years of imprisonment. In Moedano's pro se petition

---

[1] Illinois Department of Corrections records indicate that Moedano is currently incarcerated at the Taylorville Correctional Center. The current warden of that facility is Darryl Edwards. Accordingly, Darryl Edwards, in his capacity as the Warden of the Taylorville Correctional Center, is hereby substituted as the respondent. *See* Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts; *Rumsfeld v. Padilla*, 542 U.S. 426, 436 (2004).

[2] The court will follow the state court's practice of referring to R.T. by her initials, as the state court found that she was the victim of sexual assault. Moreover, she is neither suing nor defending under a fictitious name since she was the complaining witness in the criminal case that is the basis of the habeas petition currently before the court. *See Doe v. Blue Cross & Blue Shield United of Wisc.*, 112 F.3d 869, 872 (7th Cir. 1997).

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, he challenges, among other things, the validity of his waiver of a jury trial and the sufficiency of the evidence presented at trial.  For the following reasons, the petition is denied.

## I.  BACKGROUND

The following facts and procedural posture relevant to Moedano's § 2254 petition are drawn from the state court record and the Illinois Appellate Court's opinion in Moedano's direct appeal.  *See* Dkt. 17.  This court will presume that the state court's factual determinations are correct for the purposes of habeas review as Moedano neither contests them nor points to clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1); *Kidd v. Lemke*, 734 F.3d 696, 703 (7th Cir. 2013).

### A.  Waiver of Jury Trial

Immediately before the start of Moedano's trial, the court had a colloquy in English with Moedano about his waiver of his right to a trial by jury.  After the following colloquy, the court concluded that Moedano sufficiently understood the English language to waive his right to a jury trial:

THE COURT:     I understand you're prepared to give up your right to trial by jury and have the Court determine if you're guilty or not guilty.  Is that, in fact, your intention?

MOEDANO:       Yes.

THE COURT:     Do you want to stand up and speak up.  Tell me what would a jury trial be, sir.

MOEDANO:       I'm sorry,

THE COURT:     What – what is a jury trial?

(pause in proceedings)

DEFENSE COUNSEL:        Judge, if I may have one minute with Mr. Moedano.

(pause in proceedings)

THE COURT:        . . . Sir, tell me what – what would a jury trial be?

MOEDANO:        Okay.  First my English is not very well.

THE COURT:        What is your native language?

MOEDANO:        Miguel Moedano.

THE COURT:        Okay.  What language do you speak?

MOEDANO:        Spanish.

THE COURT:        Okay.  Call a Spanish interpreter . . . . What is a jury trial?

MOEDANO:        The one the – the 15 people.

THE COURT:        Do what?

MOEDANO:        To judge me if I'm like.

THE COURT:        They judge you?

MOEDANO:        Well –

THE COURT:        Yeah.  Is that what you're saying?

MOEDANO:        Well, yes.

THE COURT:        All right.  I have observed – observed the Defendant execute a jury waiver in my presence.  I find that the waiver is given knowingly and voluntarily.  It shall be accepted. [Defense counsel], have you always communicated with your client in English?

DEFENSE COUNSEL:        Yes . . . . I've only conversed with Mr. Moedano in English since the time I've known him these last two years.  I think Mr. Moedano is just very nervous right now . . . .

| THE COURT: | I have talked to Mr. Moedano on any number of occasions and there's never been any apparent breach or failure to communicate.  Do you need the services of a Spanish interpreter, sir? |

| MOEDANO: | In some cases I don't understand a few words. |

| THE DEPUTY SHERIFF: | I called, Judge. |

| THE COURT: | Okay.  All right.  Have a seat, sir.  We'll wait for the interpreter. |

Dkt. 17-3, Ex. I (Trial Tr. Part I) at Q-2-4.  The trial began once an interpreter arrived.

Although Moedano had an interpreter at his trial, the transcripts for the pre-trial proceedings do not reflect the use of an interpreter.  *Cf. id*. at Q-4 (swearing the interpreter at the start of trial).  The record shows that at one of the pre-trial status hearings, Moedano's attorney failed to appear.  *Id*. at M-3.  Moedano had a brief discussion in English with the trial court:

| THE CLERK: | Miguel Moedano. |

| PROBATION OFFICER: | I don't know why it's on the call. |

| THE COURT: | . . . Did you put the case on the call? |

| MOEDANO: | I'm supposed to have Court today.  I called my lawyer.  I don't have you today. |

| THE COURT: | Mike is your lawyer. |

| MOEDANO: | Mike. |

| PROBATION OFFICER: | I checked the records, I don't know why it's up today. |

| THE COURT: | Your lawyer is not coming today? |

| MOEDANO: | No, he's not here.  If I call him, maybe because he's close, he can come.  I need to find out what the next day in Court is. |

| THE COURT: | . . . . Come back on February 9th, sir. |
|---|---|
| MOEDANO: | Thank you very much. |

*Id.*

## B.     Moedano's Trial and Sentencing

### 1.     Opening Statements

In his opening statement, defense counsel told the court that "this case is about one thing and one thing only, whether Mr. Moedano had a reasonable belief that the complainant in this case consented to these sex acts." *Id*. at Q-7.   Counsel reviewed what he believed the evidence would show and explained that [Moedano's] "defense was that this was all entirely consensual, that Mr. Moedano at all times had a reasonable belief that the victim – that the complaining witness was consenting to these various sex acts." *Id*. at Q-8-9.  Finally, he concluded, "Judge, we believe that the evidence will show that Mr. Moedano reasonably believed that all – all of what occurred here was consensual.  At no time did the complaining witness struggle . . . . At no time did the complaining witness have to fend herself off any forceful advance." *Id*. at Q-9.

### 2.     The Evidence

#### a.     Medical Testimony

The State's first witness was an attending physician who worked at the emergency room at Illinois Masonic Hospital on September 30, 2005.  R.T. arrived at the emergency room at 1:40 p.m. on September 30, 2005.  The doctor testified that he found three lacerations and bleeding in R.T.'s vaginal area consistent with rigorous or forceful penetration.

He also testified that GHB is an abbreviation for gamma hydroxybutric acid or gamma hydroxybutyrate.  GHB generally "causes an altered state of mentation, causes depressed levels

of consciousness and impaired memory as well as can cause nausea and vomiting." *Id*. at Q-22. Traces of GHB can be detected via urinalysis for up to twelve hours. According to the doctor, urinalysis did not reveal the presence of GHB, colloquially known as a "date rape drug," in R.T.'s system. He testified, however, that the negative result did not exclude the possibility that she had been drugged because test results can be affected by a victim's body weight, the passage of time, and the number of times an individual urinates between ingesting GHB and taking a urine test.

Finally, the doctor testified about Rohypnol, a form of benzodiazapine that can cause symptoms similar to GHB. He noted that R.T. took prescription Xanax, which is another type of benzodiazapine. Given her prescription for Xanax, R.T. was not tested for the presence of benzodiazapine.

### b.    R.T.

R.T. testified that on September 29, 2005, she visited Moedano, whom she had met two nights earlier, at a restaurant in the Lake View neighborhood on the north side of Chicago where he worked as a bartender. Moedano served R.T. a margarita and two shots of tequila. After she started to drink the margarita, R.T. "felt kind of weird" in a way that was different than she "usually had when [she] drank so [she] just stopped drinking it." Dkt. 17-3, Ex. I (Trial Tr. Part I) at Q-42. After Moedano's shift ended, he and R.T. went to two nearby bars and drank alcohol. At this point, R.T. had "difficulty concentrating" and felt "very, very strange" and "unusually comfortable around" Moedano even though she was normally suspicious of people she had just met. *Id*. at Q-42-43.

R.T. agreed to go to Moedano's apartment to retrieve some CDs. After he gave her a glass of water to drink, she felt "horrible." *Id*. at Q-44. She became "sick to [her] stomach" and "[e]verything started to go cloudy" as she became "very, very dizzy." *Id*. When R.T. tried to leave, Moedano told her that "he couldn't let her leave in that condition" and followed her out the door and into a taxi. *Id*. at Q-45. The cab driver told R.T. to let him know if she needed him to pull the cab over so she could throw up. During the cab ride, R.T. repeatedly asked Moedano if he had put something in her drink. He responded "that he just put love in [the] margarita." *Id*. Moedano put her hand in his lap during the cab ride but she retracted it. She could not recall if they spoke about that contact or if they kissed.

Upon their arrival at R.T's apartment, R.T. threw up four times in the front yard before making her way to her apartment, where she threw up again in her bathroom. She testified that although her recollection was "very cloudy," she recalled that Moedano took her dog for a walk and she "[s]omehow . . . ended up in [her] pajamas" which consisted of a knee-length shirt and baggy long grey pants. *Id*. at R-46. R.T. went to bed and had "horrible tremors." *Id*. at Q-47. She was "shaking very badly" and "trying to hang on to consciousness" and then "just couldn't any more." *Id*.

She was in and out of consciousness during the night and could not recall exactly what happened each time she regained consciousness. However, she testified that she awoke on three occasions to find Moedano rubbing her vagina with his fingers, trying to place his penis inside her vagina, and holding her legs up to her head while penetrating her vagina with his penis. *Id*. at Q-48-49. She tried to push him away but was "very weak" and then told him "it hurt." *Id*. at

Q-47-49.  She  "couldn't really move but he wouldn't stop" and then she passed out again.  *Id*. at Q-49.

When she awoke, Moedano was insistent that they engage in further sexual activity.  R.T. knew that she "didn't want him inside [her] again."  *Id*.  She felt "a little more coherent" and thus agreed to Moedano's request that she "pose" on her hands and knees "with [her] rear end up in the air."  *Id*. at Q-49-50.  She pushed Moedano's hand away after he inserted it in her rectum and then acceded to his request to place her hand on his penis in the hope that doing so would end the encounter and prevent him from being able to place his penis in her vagina again.  She felt mentally clearer at this point and "was very angry."  *Id*. at Q-73.

The next morning, Moedano and R.T. awoke when the alarm went off.  R.T. told Moedano never to contact her again and then fell back asleep because she felt physically ill and could not concentrate.  When she awoke, she still felt "really horrible" and "couldn't process anything in any kind of order."  *Id*. at Q-54.  She called a friend "to help [her] figure out what had happened the night before" and then called Planned Parenthood and said she had "been drugged and that the person who did it had been inside of [her] and [she] didn't know what to do."  *Id*. at Q-55, 81.  She went to Planned Parenthood and then the emergency room at Illinois Masonic Hospital, where she was examined.  She also spoke with police.  R.T. testified that she never consented to any sexual contact with Moedano and could not have consented because she was "out of it" and "in and out of consciousness."  *Id*. at Q-74.

### c.      Detective Weitzman and the Parties' Stipulations About Test Results

Detective Josh Weitzman testified that he interviewed R.T. when she was at the emergency room.  According to Weitzman, she did not tell him that Moedano had put "love in

her margarita" but "was very upset. She was crying. She was distraught I guess." Dkt. 17-4, Ex. K (Trial Tr. Part II) at R-14-15. The parties presented stipulations that no illegal substances were found on the boots that R.T. was wearing on the night of the alleged assault and that R.T's urine tested negative for GHB.

### d. Moedano

As a witness in his own defense, Moedano testified through an interpreter, stating that having the interpreter made him "feel more comfortable." *Id*. at R-20. He stated that on the night in question, R.T. did not appear to be intoxicated and never verbally indicated a lack of consent to sexual contact. According to Moedano, he and R.T. kissed when they were in his apartment. R.T. then invited him to her apartment. She did not appear to be ill and expressed concern about her dog. R.T. and Moedano kissed during the cab ride to her apartment and she put her hand on his leg. He denied hearing the cab driver say anything about R.T. potentially throwing up inside the cab. He admitted, however, that R.T. threw up outside her apartment and that it looked like she would continue to throw up once she got inside.

When Moedano and R.T. went upstairs to R.T.'s apartment, he told her to put her finger into her throat to help her throw up because "it look[ed] like she wanted to throw up" and she was asking for water. *Id*. at R-36. He then walked her dog because he did not want to see her throw up again. *Id*. When he returned, R.T. was wearing her pajamas. According to Moedano, R.T. invited Moedano to stay and they both got into bed and undressed.

Moedano testified that he inserted his fingers, not his penis, into R.T's vagina and anus. R.T. never told him "no" and did not need to tell him that she wanted to engage in sexual activity because she was voluntarily doing so by touching his penis with her hand and mouth and then

pulling and hugging him to make him put his mouth on her vagina. Moedano also testified that R.T. did not pass out at any point during the encounter and that he fell asleep before she did. He denied that R.T. was angry the night of the alleged assault or the next morning or that she accused him of putting something in her drink.

### 3. Closing Arguments

Defense counsel began his closing argument by stating that "this case focuses on one issue, whether or not Mr. Moedano knew that the victim was unable to give knowing consent." *Id.* at S-7. Counsel then stated that alcohol played a role in "this unfortunate incident" but not to the extent that R.T. "was so intoxicated that she was unable to consent to these acts." *Id.* at S-8. Counsel also stressed that R.T. did not testify that she said no, but acknowledged that she was not required to do so. In addition, he asked the judge to put himself in Moedano's position and ask if Moedano reasonably knew or should have known that R.T. had not consented.

Counsel then stated that the only physical sign that R.T. testified that she gave Moedano was pushing Moedano's hand from her rectal area and that in response, Moedano stopped touching her there. The trial judge noted that R.T. had also testified that she pulled her hand away when Moedano tried to place it into his lap when they were in the cab and that he believed that was a "clear instance of the victim saying no or actioning no." *Id.* at S-10. In response, counsel reminded the judge that Moedano had testified that he and R.T. voluntarily kissed in the cab so it was a "close call." *Id.* at S-11.

### 4. The Verdict

After closing arguments, the trial court announced its findings. After summarizing how R.T. met Moedano at his place of employment and the two bars Moedano and R.T. visited together, the court stated:

> We find the following question [in the transcript of R.T.'s testimony]: Did you eventually leave his apartment? Answer: Yes. Question: What happened when you tried to leave the Defendant's apartment? Answer: He told he couldn't let me leave in that condition. I believe that to be an important observation, "he told he couldn't let me leave in that condition." The Defendant followed the victim out onto the street where, together, they caught a cab to the victim's home. What happened in the cab has been contradicted, and I place no importance [on] it because it was contradicting.

> But once arriving at the apartment, . . . the victim testified that she threw up four times in the [flowers] outside of her house in the court way of the building and then went up to her apartment to the bathroom and threw up again. In the Defendant's testimony he acknowledge[d] observing the victim in distress, seeing her throw up and choosing to walk the dog because he didn't want to see that regurgitation or that physical act again, but then at one point [he] suggest[s] to the victim that perhaps she should put her finger in her mouth. And we know that triggers a reaction.

> When the Defendant returned from walking the dog, he testifies that he observed the victim on the bed. And as [the prosecutor] correctly points out, she was attired in some of the most seductive clothing you could find. The only thing that was missing was the big rollers, the big hair rollers.

> If a person ever said no, I think that was it. And I think that the Defendant knew that the victim was in distress, you can't leave his apartment in that condition.

*Id*. at S-19-21.

The trial court then found Moedano guilty of two counts of criminal sexual assault based on his placement of his penis and his finger into her vagina knowing that she could not consent. He found Moedano not guilty of the remaining four counts of criminal sexual assault. When it announced these findings, the trial court quoted the charges as requiring that Moedano acted

-11-

"knowing the victim was unable to give knowing consent." *Id*. at S-21-22. It also added that the

evidence did not show that Moedano had given R.T. any "mind altering substances." *Id*. at S-24.

### 5. Moedano's Motion for a New Trial

Moedano filed a motion for a new trial arguing, among other things, that the court should

not have given any weight to R.T.'s choice to change into a pair of baggy pajamas. The court

stated, "I have been married 32 years. I know the deal. They can say whatever they want, my

colleagues on the Appellate Court. I know the deal. Go to bed, watch television, go to sleep, do

whatever you want to do, don't bother me." *Id*. at GG-38. Defense continued to press the

clothing issue by arguing that it turned on a matter of law. The court responded, "I don't know

who wrote that. Someone who is not married." *Id*. at GG-39.

The court denied Moedano's motion for a new trial, explaining:

> The big flabby flannel night clothes on a first date. Please. Throwing up. It is all
> that occurred leading up to the act. It's I have to go home. It's pushing away in
> the cab. It's throwing up when you get out of the cab . . . . It's letting a total
> stranger walk your dog. You have lost control. Letting a total stranger into your
> house. You have lost control.

*Id*. at GG-39-40.[3] The trial court then rejected defense counsel's argument that its ruling

impermissibly extended the definition of sexual assault because many people on a first date

allow the date to return to their homes or walk their dogs.

---

[3] This court notes that when the trial judge announced the verdict, he stated that he had
not given weight to the conflicting testimony about what happened during the cab ride to R.T.'s
apartment. When he denied Moedano's motion for a new trial, however, he referred to "pushing
away in the cab." Thus, it appears that the trial court credited R.T.'s version of what transpired
in the cab.

**6.      Sentencing**

During the sentencing proceedings, the parties raised the language issue again because the presentence investigation report was in English.  Defense counsel said Moedano was "fluent in English" and had studied English for a year-and-a-half in college so he understood English but felt more comfortable hearing legal issues discussed in Spanish.  Dkt. 17-4, Ex. K (Trial Tr. Part II) at II-7-8.  In response to questioning by the court, Moedano said, in English, that he could understand normal conversation but did not feel that he understood all legal words.  The trial court stated that, based on the numerous pretrial proceedings conducted in English, that it was "crystal clear" that Moedano understood proceedings in English.  In response, Moedano's counsel reaffirmed that his client "was fluent.  He never claimed to not be fluent . . . . he always said he wanted an interpreter because sometimes the legal jargon is what he had a problem with . . . . I think he's been very consistent with me as to why he wanted an interpreter."  *Id*. at II-8.

Ultimately, the trial court sentenced Moedano to two consecutive terms of five years of imprisonment.

**C.      Moedano's Direct Appeal**

Moedano appealed to the Illinois Appellate Court with the assistance of counsel, raising five claims:

1.      He did not knowingly waive his right to a jury trial.

2.      The evidence was insufficient to prove that he knew that R.T. could not knowingly consent to sexual activity.

3.      He was denied due process of law because:

a.      the trial court misunderstood the elements of criminal sexual assault, thereby relieving the prosecution of its burden to prove that he knew that R.T. could not knowingly consent; and

b.   the trial court impermissibly relied on his own personal opinion when denying Moedano's motion for a new trial.

4.   Trial counsel was ineffective because he:

   a.   presented a defense based on a misunderstanding of the elements of criminal sexual assault;

   b.   mischaracterized the evidence during closing argument by saying the case was "a close call"; and

   c.   failed to object to R.T.'s testimony that Moedano said that he could not allow her to leave his apartment "in that condition" on the ground that the use of this statement at trial violated Illinois discovery rules.

5.   The trial court violated his right to a fair hearing on the motion for a new trial when it relied on its personal knowledge of trial counsel's abilities when rejecting Moedano's claim of ineffective assistance of counsel.

The Illinois Appellate Court affirmed Moedano's convictions and sentence and denied his petition for rehearing.

Moedano filed an unsuccessful petition for leave to appeal ("PLA") with the Illinois Supreme Court with the assistance of counsel, arguing that:

1.   The trial court's misunderstanding of the elements of criminal sexual assault relieved the State of its burden to prove that he knew that R.T. was incapable of knowingly consenting to sexual activity, thus preventing him from being convicted based on sufficient evidence to establish that he had committed criminal sexual assault;

2.   Trial counsel was ineffective because he presented a defense based on a misunderstanding of the elements of criminal sexual assault; and

3.   Moedano did not knowingly waive his right to a jury trial.

Moedano did not file a state post-conviction petition seeking collateral review of his conviction and sentence and the time for doing so has expired.

**D.   Moedano's Federal Habeas Petition**

In July 2011, Moedano signed his § 2254 petition and sent it to the United States District Court for the Southern District of Illinois (the district in which he was confined). The petition was transferred to this district because Moedano's petition challenges his conviction following a trial in the Circuit Court of Cook County.

This court has liberally construed Moedano's petition and all of his filings as he is proceeding pro se. In his petition, Moedano argues:

1.   He did not knowingly waive his right to a jury trial because the colloquy with the trial judge about this issue took place in English without the assistance of a Spanish interpreter, unlike the trial, when he had an interpreter.

2.   The trial judge denied him his right to due process because he:

     a.   misunderstood the elements of criminal sexual assault and thus "failed to require that the State prove the **DEFENDANT'S** state of mind such that he knew the victim was 'unable to give knowing consent.'" R. 1, Petition, at 5 (emphasis in original); and

     b.   Convicted Moedano despite insufficient evidence showing that he knew R.T. could not knowingly consent.

3.   Trial counsel was ineffective because he:

     a.   failed to investigate "the side-effects of the victim's medication," *id*. at 6, which "offers a possible explanation of all the behaviors exhibited by the victim" which Moedano could not have known about at the time; and

     b.   did not understand that the charged offenses required Moedano to know that the victim is incapable of knowing consent and thus presented a defense focusing on whether R.T. had consented.

4.   His right to due process was violated because:

     a.   the trial court's statement that the victim's attire expressed her lack of consent via her choice of nightwear undermined the guilty verdict; and

     b.   when the trial court denied Moedano's motion for a new trial, his reference to R.T.'s "loss of control" and his own personal experiences

-15-

meant that the court used its own values to transform a "one night stand" into a sexual assault. *Id.* at 9.

## II. STANDARD OF REVIEW FOR NON-DEFAULTED CLAIMS

To the extent that Moedano preserved his claims so that this court may reach their merits, he is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 if the challenged state court decisions are either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams*, 529 U.S. at 405.

With respect to the "unreasonable application" prong of § 2254(d)(1), Moedano must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 407. A state court's application of Supreme Court precedent is unreasonable if its decision was "objectively" unreasonable. *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011). "This demanding standard allows us to issue a writ only in cases 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. It goes no farther.'" *Carter v. Butts*, — F.3d —, No. 13-2466, 2014 WL 3673402, at *3 (7th Cir. July 25, 2014) (quoting *Harrington*, 131 S.Ct. at 786).

## III. DISCUSSION

For the following reasons, Moedano is not entitled to relief based on Claim 1 (waiver of the right to trial by jury), Claim 2(b) (sufficiency of the evidence) or Claim 3(b) (ineffective assistance of trial counsel based on counsel's understanding of the elements of the offense). In addition, Claim 2(a) (a due process claim based on the trial court's allegedly incorrect understanding of the elements of the offense) is procedurally defaulted under the independent and adequate state ground doctrine and, alternatively, fails on the merits. Moedano's remaining claims – Claim 3(a) (ineffective assistance of trial counsel based on the failure to investigate the effect that Xanax had on R.T.) and Claims 4(a) and (b) (an alleged violation of due process based on the trial court's statements about R.T.'s pajamas and her "loss of control") are procedurally defaulted because Moedano did not present them in one full round of state court review and none of the exceptions to procedural default are applicable.

## A.      Claim 1 – Waiver of the Right to Trial by Jury

First, Moedano asserts that he did not knowingly waive his right to a jury trial because the colloquy with the trial court about this issue was in English and he did not have the assistance of an interpreter. According to Moedano, his inability to understand English without an interpreter means that he could not knowingly waive the right to a trial by jury. In response, the respondent argues that trial counsel's failure to make a contemporaneous objection to conducting the proceedings in English without an interpreter means that this claim is procedurally defaulted under the independent and adequate state ground doctrine. Alternatively, the respondent argues that this claim fails on the merits.

The Illinois Appellate Court held that Moedano had forfeited this claim because his counsel did not object to proceeding in English, stating:

> The record reflects that [Moedano] did not object to the trial court's acceptance of his jury waiver contemporaneously or in a posttrial motion. Although such oversights normally cause a defendant to have forfeited his argument on appeal (*see In re R.A.B.*, 197 Ill.2d 358, 362 [ ] (2001), the right to a trial by jury is so fundamental that we may consider his argument under the plain-error rule (*People v. Bracey*, 213 Ill. 2d 265, 270 [ ] (2004); *see* Ill. 2d R. 615(a) (plain-error rule)).

*People v. Moedano*, No. 05 CR 23784 (Ill. App. 2010) ("Direct Appeal Opinion"), R. 17-1 at 12. The Illinois Appellate Court also rejected this claim on the merits.

Under the independent and adequate state ground doctrine, a federal habeas court may not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), superseded by statute on other grounds, 28 U.S.C. § 2254(b)(2). A state law ground is independent when "the state court actually relied on a state rule sufficient to justify its decision" and is adequate when the state court applies the rule "in a consistent and principled way." *Prihoda v. McCaughtry*, 910 F.2d 1379, 1382-83 (7th Cir. 1990).

"[A]n Illinois court does not reach the merits of a claim simply by reviewing it for plain error." *See Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005); *see also Moore v. Bryant*, 295 F.3d 771, 774 (7th Cir. 2002) (holding that "if the decision of the last state court to which the petitioner presented his federal claims fairly appears to rest primarily on the resolution of those claims, or to be interwoven with those claims, and does not clearly and expressly rely on the procedural default, we may conclude that there is no independent and adequate state ground and proceed to hear the federal claims").

Here, the Illinois Appellate Court held that Moedano was entitled to plain error review due to his counsel's failure to object during trial. R. 17-1 (Direct Appeal Opinion) at 12.

However, it then engaged in a 3-page detailed discussion of the merits of Moedano's jury waiver argument.  It is unnecessary to decide whether this disposition shows that the Illinois Appellate Court reached the merits instead of reviewing for plain error when rejecting Moedano's jury waiver claim (which would mean that the independent and adequate state ground doctrine would not apply), as the claim lacks merit.

A criminal defendant may waive his Sixth Amendment right to trial by jury if he does so knowingly and voluntarily.  *See Parke v. Raley*, 506 U.S. 20, 28-30 (1992).  Knowing consent "can be inferred from circumstances such as a colloquy in which the defendant unequivocally acknowledges his desire to waive the right to a jury trial, comments by counsel demonstrating that the client personally accepted the waiver, evidence that the defendant passively sat by while counsel waived the right . . . and the defendant's ability to express his own wishes or [his] ability to understand the concept of waiver."  *United States v. Johnson*, 306 Fed. Appx. 305, 379-80 (7th Cir. 2009) (internal citations omitted).  Moreover, in order for a waiver to be valid, "the trial judge need not explain the ramifications of a waiver in terms of the number of votes required for conviction or acquittal."  *Whitehead v. Cowan*, 263 F.3d 708, 732 (7th Cir. 2001).

In rejecting Moedano's jury-waiver claim, the Illinois Appellate Court held that:

A defendant may waive his constitutional right to a trial by jury, but his waiver will be considered valid only if it was understandingly made.  *Bracey*, 213 Ill.2d at 269; 725 ILCS 5/103-6 (West 2006).  "Whether a jury waiver is valid cannot be determined by application of a precise formula, but rather turns on the particular facts and circumstances of each case." *Bracey*, 213 Ill.2d at 269.  "A defendant who challenges his jury waiver bears the burden of establishing that the waiver was invalid." *People v. Gibson*, 304 Ill. App. 3d 923, 929-30 [ ] (1999).

[Moedano] here argues that his waiver was not knowing and understanding because he had limited facility with the English language.  When a defendant alleges that a linguistic handicap impeded his ability to understand the nature of his jury waiver, "a reviewing court, which has before it only the written record,

'should accord more than ordinary deference to the conclusions of the trial judge, who observed . . . demeanor and gestures and heard possibly important variables of inflection and emphasis.'" *People v. Totah*, 192 Ill. App. 3d 239, 248 [ ] (1990), quoting *People v. Ortiz*, 96 Ill. App. 3d 497, 503 [ ] (1981).

Here, the record offers us little reason to question the trial court's conclusion, based explicitly on its observations of [Moedano] throughout proceedings, that [Moedano] English skills were sufficient to facilitate his knowing and understanding jury waiver. Indeed, the record demonstrates that [Moedano] communicated effectively with the trial court, in English, both at a pretrial hearing at which defense counsel did not appear and during the jury waiver hearing.

[Moedano] disputes this latter point and characterizes as "incomprehensible" his responses to the trial court's questions about the nature of a jury trial. We disagree. Although [Moedano's] responses might fail an exacting grammatical standard, they were, with one exception, entirely responsive to the trial court's questions. They also demonstrated that he understood a jury to be "the 15 people" "to judge him." [Moedano's] miscounting of the jury's size aside, this answer shows a meaningful understanding of the right that he and the trial court were discussing. Further, the trial judge's finding that [Moedano] had sufficient understanding of the English language was accompanied by a reassurance from defense counsel after a private conversation with [Moedano], and from [Moedano] himself, who claimed to have struggled to understand only "a few words" during pretrial proceedings. *See People v. Martinez*, 324 Ill. App. 3d 711, 720 [ ] (2001) ("the trial court was entitled to rely on defense counsel's representations that the interpreter was not needed") . . . . [W]e have an indication that [Moedano] understood the role of the jury in our judicial system because [Moedano] himself explained it in open court. Accordingly . . . we reject [petitioner's] argument that his conviction must be reversed due to an invalid jury waiver.

R. 17-1 (Direct Appeal Opinion) at 11-14.

As noted above, in his § 2254 petition, Moeadano argues that his grasp of English was insufficient to allow him to knowingly and intelligently waive his right to trial by jury. The first problem with this argument is that Moedano has not shown (let alone shown with "clear and convincing evidence") that the trial court's factual holding that he is proficient in English was

erroneous.  *See* 28 U.S.C. § 2254(e).  Moreover, the Illinois Appellate Court's finding to this effect is reasonable because it is amply supported by the record.

The trial judge's comment that he had "talked to [Moedano in English] on any number of occasions and there's never been any apparent breach or failure to communicate" (R. 17-1 (Direct Appeal Opinion) at 4) is consistent with the transcript of proceedings memorializing Moedano's direct interaction with the trial judge when Moedano's counsel missed a status hearing.  Dkt. 17-3, Ex. I (Trial Tr. Part I) at M-3.  Moedano's trial attorney told the trial judge that he had conversed with his client exclusively in English for two years and ascribed any hesitancy during the jury-waiver colloquy to nervousness.  Moedano's post-trial attorney noted that Moedano had taken "a year-and-a-half of English at Truman College when he arrived in the United States" seventeen years prior to the trial and was "fluent in English . . . . He never claimed to not be fluent . . . . he always said he wanted an interpreter because sometimes the legal jargon is what he had a problem with."  Dkt. 17-4, Ex. K (Trial Tr. Part II) at II-8.  Finally and most critically, Moedano was able to express the concept of a trial by jury as he communicated – in English, in response to questions in English – that a jury trial means that a defendant is judged by other people like him.  *See Johnson*, 306 Fed. Appx. at 379-80 (holding that a waiver is knowing and voluntary when a "defendant underst[ands] that the choice confronting him [is], on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge") (internal quotations omitted).

In sum, Moedano's alleged inability to understand English without an interpreter is the basis of his jury waiver claim.  The record establishes that Moedano had a sufficient command of

English to understand the proceedings and waive his right to a trial by jury but nevertheless wanted an interpreter during his trial because it made him feel more comfortable with the important legal proceedings that were taking place.  His desire to have an interpreter for that reason fails to demonstrate, by clear and convincing evidence, that the trial court's finding that he could speak English fluently was unreasonable.  Thus, the trial court's findings about his English skills mean that Moedano is not entitled to habeas relief based on the absence of an interpreter during the colloquy about the waiver of the right to trial by jury.

**B.**     **Claims 2(a), 2(b), and 3(a) – The Trial Court's Understanding of the Elements of the Offense/ Sufficiency of the Evidence and Ineffective Assistance of Trial Counsel Based on Counsel's Understanding of the Elements of the Offense**

Next, Moedano argues that the trial court and his attorney erroneously believed that consent is a valid defense to criminal sexual assault under § 5/12-13(a)(2).  Based on this contention, he asserts that the trial court's misunderstanding of the elements of criminal sexual assault caused his trial to focus on consent.  According to Moedano, this impermissibly relieved the State of its burden to prove that he knew that R.T. was incapable of consenting to sexual activity (Claim 2(a)).  In addition, he asserts that the misunderstanding violated his right to due process because it caused him to be convicted without sufficient evidence to show that he knew that R.T. was unable to consent (Claim 2(b)).  Relatedly, Moedano asserts that trial counsel's reliance on an active consent defense was constitutionally ineffective because it demonstrated that counsel misunderstood the elements of criminal sexual assault (Claim 3(a)).  As these three claims all flow from the elements of the offense of criminal sexual assault, the court will discuss them together.

1.      **Claim 2(a) – The Trial Court's Understanding of the Elements of the Offense**

   a.      **Criminal Sexual Assault Under Illinois Law**

At the relevant time, to establish that a defendant committed criminal sexual assault, the State had to prove that the defendant "commit[ted] an act of sexual penetration and . . . knew that the victim was unable to understand the nature of the act or was unable to give knowing consent."  R. 17-1 (Direct Appeal Opinion) at 15 (citing 720 Ill. Comp. Stat. § 5/12-13(a)(2)). "The statute prohibiting criminal sexual assault prohibits a person from taking sexual advantage of another when the other is unable to knowingly consent to the act.  Thus, if the perpetrator knows that the other person may be unable, for any reason, to give consent to the sexual act, the perpetrator should refrain from taking advantage of the situation."  *People v. Fisher*, 667 N.E.2d 142, 146 (2d Dist. 1996) (affirming conviction where the intoxicated victim lost consciousness "immediately prior to and during at least part of the sex act").  When a defendant is charged under § 12-13(a)(2), the trier of fact must evaluate the reasonableness of the defendant's belief that the complaining witness consented.  *Id*.

   b.      **State Court Proceedings**

On direct appeal, Moedano argued that the trial court's alleged confusion about the elements of the offense of criminal sexual assault denied him due process by relieving the State of its burden to prove the elements of this offense beyond a reasonable doubt.  The Illinois Appellate Court considered this claim using the plain error standard of review because Moedano did not raise it before the trial court.  It rejected Moedano's claim that the trial court's reference to R.T.'s modest nightwear sending a "no" message meant that the trial court thought that the case turned on whether R.T. had consented, explaining that in context, it was clear that the trial

-23-

court was speaking figuratively to rebut Moedano's claim that R.T. had consented. The Illinois Appellate Court also disagreed with Moedano's claim that the trial court's finding that R.T. was "in distress" meant that the trial court believed that vomiting alone could give him knowledge that R.T. could not consent, stating that the "in distress" comment referenced all of R.T.'s physical symptoms.

### c.    Moedano's Federal Claim

The Illinois Appellate Court reviewed Moedano's claim that the trial court did not understand the elements of the offense of criminal sexual assault for plain error because it found that his counsel had forfeited this issue by failing to object during trial. The respondent argues that the use of plain error review based on counsel's failure to object is an independent and adequate state ground that precludes federal habeas review.

As noted above, "a state law ground is independent when the court actually relied on the procedural bar as an independent basis for its disposition of the case," *Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010), and the state court's ruling does not appear to rest on the merits, *Moore*, 295 F.3d at 774. The fact that a state court conducts plain error review does not mean that its decision rests on the merits, as opposed to forfeiture. *Miranda*, 394 F.3d at 992. This is precisely what happened here as the Illinois Appellate Court reviewed Moedano's claim about the trial court's purported misunderstanding of the law for plain error and its ruling appears to be based squarely on this ground. Thus, the independent and adequate state ground doctrine procedurally bars Moedano's claim that the trial judge misunderstood the elements of the offense.

In any event, Moedano's due process claim about the trial court's understanding of the elements of the charged offense fails on the merits. A federal court may issue a writ of habeas corpus to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Wilson v. Corcoran*, 562 U.S. 1, 16 (2010) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). This means that to the extent Moedano is arguing that the trial court misapplied state law, his claim is not cognizable for purposes of federal habeas review.

Turning to Moedano's characterization of this claim as a denial of federal due process, a due process claim based on an alleged error of state law is cognizable in a federal habeas proceeding if the purported error was so serious that it deprived the defendant of a fundamentally fair trial. *See Perruquet v. Briley*, 390 F.3d 505, 510-11 (7th Cir. 2004). As the Illinois Appellate Court noted, Moedano did not dispute that he "commit[ted] an act of sexual penetration." 720 Ill. Comp. Stat. § 5/12-13(a)(2). Thus, the key issue was whether he "knew that the victim was unable to understand the nature of the act or was unable to give knowing consent." *Id*.

Moedano's defense was that R.T.'s affirmative consent showed that she was capable of consenting. Given this defense, the trial court necessarily had to address consent when considering the reasonableness of Moedano's purported belief that R.T. was capable of consenting. Thus, the state court's references to consent were unavoidable. As such, they clearly were not erroneous let alone errors "of constitutional magnitude." *See id*. Moedano is not entitled to habeas relief based on Claim 2(a).

## 2.     Claim 2(b) – The Sufficiency of the Evidence

Moedano next approaches his argument that the trial court's alleged misunderstanding of the elements of the offense of criminal sexual assault deprived him of due process from a different angle.  Specifically, he contends that trial court's focus on consent caused the State to present evidence that was insufficient to support his conviction because it did not show that he knew that R.T. was incapable of consenting.

### a.     State Court Proceedings

The Illinois Appellate Court summarized the law governing Moedano's sufficiency of the evidence claim as follows:

> For a reviewing court considering a defendant's challenge to the sufficiency of the evidence to convict him, "the question is whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *People v. Cunningham*, 212 Ill. 2d 274, 278 [ ] (2004), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 [ ] (1979).  The two counts of sexual assault for which [Moedano] here was convicted required that the State prove that he "committed an act of sexual penetration and . . . knew that the victim was unable to understand the nature of the act or was unable to give knowing consent."  720 ILCS 5/12-13(a)(2) (West 2006).

R. 17-1 (Direct Appeal Opinion) at 14-17.

It then rejected this claim, explaining:

> [Moedano] does not dispute that he committed the requisite acts of sexual penetration; he argues that the State failed to prove that he did so knowing that the victim was unable to consent.

> To press his argument, [Moedano] emphasizes his own testimony at trial and discounts the victim's testimony on the ground that the quality of her recollection was inconsistent.  Relying on the trial court's finding that he acted knowing that the victim was "in distress," as well as [the trial court's] failure to find that she had been administered a "date rape drug," [Moedano] also argues that the only outward indicia of the victim's distress were her vomiting episodes.  According to [Moedano], this vomiting alone could not have conferred knowledge to him that

the victim was unable to consent. However, the trial court's finding that the victim was "in distress" seems not a reference limited to her vomiting episodes, but a general reference to all the symptoms of distress she described in her testimony. Those symptoms included vomiting, which [Moedano] admitted having seen, as well as lapsing consciousness. Even without evidence that [Moedano] administered a "date rape drug" to the victim, her testimony that she was unconscious when [Moedano] initiated various sexual contacts with her was sufficient to prove that he initiated those contacts while knowing that she was unable to consent. To the extent that [Moedano] challenges the victim's testimony on the ground that she could have no credible recollection of events that occurred while she was passing in and out of consciousness, we defer to the trial court's evaluation of the witnesses' testimony.

[Moedano] further argues that, even if we accept the testimony that the victim was unconscious, that fact alone could not establish his knowledge that she could not consent. On this point, [Moedano] notes the victim's admitted participation toward the end of the encounter – she testified that she acquiesced in [Moedano's] request that she pose herself and that she placed her hand on his penis – as well as the idea that the two had "a certain level of intimacy" prior to the assault. However, the victim explained that she participated toward the end of the encounter as a means to end the encounter, which to that point had taken place largely while she was unconscious. As for their prior "certain level of intimacy," we think a rational trier of fact could easily have concluded that any such feelings would not have precluded [Moedano] from knowing that an unconscious person could not consent to sexual contact. Accordingly, again, the victim's testimony provides ample basis for a rational trier of fact to conclude that [Moedano] must have known the victim could not consent, and we must defer to the trial court's determination.

Further, the trial court's apparent decision to disbelieve [Moedano's] account, and to believe the victim's account, has firm grounding in the record. [Moedano's] testimony was incredible on several points. For example, he denied having noted at his apartment that the victim appeared in distress, but his only explanation for accompanying her in her cab ride from his apartment was her otherwise inexplicable concern about her dog. He denied that the victim appeared uneasy during the cab ride, but he agreed that she vomited upon arriving outside her apartment. He denied having placed his penis in her vagina, but, as the State notes, the medical testimony regarding her lacerations strongly indicated otherwise. For these reasons, and because the victim's testimony provided a basis for a rational trier of fact to conclude that [Moedano] acted while knowing that the victim could not consent, we reject [Moedano's] argument that the State failed to prove him guilty beyond a reasonable doubt.

*Id*. at 15-17.

### b.     Moedano's Federal Claim

The Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), governs

Moedano's sufficiency of the evidence claim.  In its opinion, the Illinois Appellate Court

expressly relied on *Jackson* and correctly identified the standard announced in that case.  The

state court's decision is thus not "contrary to" clearly established federal law as determined by

the United States Supreme Court.  *See* 28 U.S.C. § 2254(d)(1); *see also Hardy v. Cross*, — U.S.

—, 132 S.Ct. 490, 494 (2011) (when a state court identifies the correct Supreme Court standard,

its decision is not "contrary to" clearly established federal law).

The court thus turns to whether the state court's decision was "an unreasonable

application of" clearly established federal law as determined by the United States Supreme

Court.  *See* 28 U.S.C. § 2254(d)(1).  First, Moedano's argument is based on a fundamental

misunderstanding of the rules governing federal habeas corpus proceedings.  "Federal courts are

in no position to redetermine the credibility of witnesses observed by state trial courts."  *Kines v.

Godinez*, 7 F.3d 674, 678 (7th Cir. 1993); *see also Marshall v. Lonberger*, 459 U.S. 422, 434

(1983) (a federal habeas court has "no license to redetermine credibility of witnesses whose

demeanor has been observed by the state trial court, but not by them").  Thus, credible testimony

from a single witness is enough to support a conviction.  *See Murphy v. Atchison*, No. 12 C 3106,

2013 WL 4495652 (N.D. Ill. Aug. 19, 2013) (collecting cases).

R.T. testified that she began to feel unwell while in Moedano's apartment and that he told

her that he "couldn't let her leave in that condition."  She threw up repeatedly in Moedano's

presence, including four times outside her apartment.  She went to bed while "shaking very

badly" and was unable to "hang onto consciousness."  As she drifted in and out of

consciousness, she felt Moedano rub his hand between her legs and try to place his penis in her vagina. When she awoke again, her pants were off and Moedano was repeatedly placing his penis in her vagina.

As reflected by the trial court's comments when explaining the verdict, the trial court found R.T. credible and disbelieved Moedano. The Illinois Appellate Court found that this conclusion had "firm grounding in the record" since R.T testified that she was unconscious when Moedano had sexual contact with her, Moedano's recitation of events was contradictory, and the medical evidence about lacerations in R.T's vagina "strongly indicated" that Moedano had placed his penis in her vagina. R. 17-1 (Direct Appeal Opinion) at 16-17. With respect to Moedano's arguments about R.T.'s agreement to "pose" and touch him, the Illinois Appellate Court noted that R.T. testified that as the night progressed, she felt more lucid and that she agreed to Moedano's request that she "pose" and placed her hand on his penis "as a means to end the encounter, which to that point had taken place largely while she was unconscious." *Id*. at 16.

This evidence, when viewed in the light most favorable to the State, is easily sufficient for any rational trier of fact to find, beyond a reasonable doubt, that Moedano knew that R.T. was unable to consent. *See Jackson*, 443 U.S. at 319; *see also Negron v. Harrington*, No. 12 C 9604, 2013 WL 5647641 (N.D. Ill. Oct. 14, 2013) (rejecting habeas petitioner's claim that the evidence was insufficient to show he was guilty of criminal sexual assault based on the minor victim's testimony and medical evidence about scar tissue in her vagina that was consistent with penetration). Thus, Moedano cannot establish that the state court's application of *Jackson* falls "well outside the boundaries of permissible differences of opinion." *See Kamlager v. Pollard*,

715 F.3d 1010, 1016 (7th Cir. 2013) (internal quotations omitted). Accordingly, Moedano is not entitled to habeas relief based on his sufficiency of the evidence claim.

### 3. Claim 3(a) – Ineffective Assistance of Counsel Based on Counsel's Understanding of the Elements of the Offense

Moedano asserts that his trial counsel's reliance on a defense of consent shows that counsel did not understand the elements of the offense of aggravated sexual assault and thus provided constitutionally ineffective assistance.

### a. State Court Proceedings

With respect to Moedano's ineffective assistance of counsel claim based on the elements of the offense, the Illinois Appellate Court found that the consent defense was "directly relevant to [Moedano's] knowledge of [R.T.'s] ability to consent; if she actually consented, then she could not have been unable to consent." R. 17-1 (Direct Appeal Opinion) at 22. The Illinois Appellate Court also held that counsel's observation that R.T. "never said no" supported the defense theory of consent and negated one way in which Moedano could have known that the encounter was not consensual, explaining:

> As for the idea that the issue of actual consent was pivotal, [Moedano] is correct that, in the abstract, the charges at issue here required the State to prove that he knew the victim could not consent, not that she actually said no. Thus, [Moedano] is also correct that, in the abstract, the victim's denying consent, and thus demonstrating that she was capable of granting or refusing consent, would actually lead to his acquittal. However, this case was not tried in the abstract. The theory of the case [Moedano] presented in his testimony was that the victim actually, and actively, consented. The choice for the trial judge, then, was whether the victim consented or whether she was unable to consent. Accordingly, under [Moedano's] theory of the case, the issue of consent was, in fact, pivotal, and counsel did not err in failing to say otherwise.

*Id.*

### b. Moedano's Federal Claim

To receive habeas relief on his ineffective assistance of counsel claim, Moedano must establish that his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-91 (1984). Under *Strickland*, this court's review of counsel's performance is "highly deferential" so to prevail, Moedano must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Woolley v. Rednour*, 702 F.3d 411, 422-23 (7th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689). If Moedano fails to satisfy either the performance or the prejudice prong of *Strickland*, the court's inquiry ends. *See Strickland*, 466 U.S. at 697.

The Illinois Appellate Court cited *Strickland* and correctly summarized the standard announced in that case. Thus, its rejection of Moedano's ineffective assistance claim is not "contrary to" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Hardy*, 132 S.Ct. at 494.

In addition, its application of *Strickland* is reasonable. Counsel's choice of a defense was consistent with Moedano's contention that R.T. had actively consented. Moreover, given Moedano's testimony about consent, it is unclear how his attorney could have avoided the topic and relied on a different defense. As the Illinois Appellate Court recognized, a consent defense was one way to show that R.T. was able to consent, because if she consented, by definition she was capable of doing so. It then held that counsel's reliance on this defense showed that he understood the applicable law. This conclusion is objectively reasonable because it is logical

and based on the evidence. *See* 28 U.S.C. § 2254(d)(1); *Harrington*, 131 S.Ct. at 786.

Moedano's ineffective assistance claim is, therefore, unavailing.

**C.** **One Full Round Procedural Default — Claims 3(a) (Ineffective Assistance of Trial Counsel Based on the Failure to Investigate the Effect That Xanax Had on R.T.) and Claims 4(a) and (b) (Alleged Violation of Due Process Based on the Trial Court's Statements about R.T.'s Pajamas and "Loss of Control")**

To preserve his claims for federal habeas review, a federal habeas petitioner must avoid procedural default by presenting those claims to all three levels of the Illinois courts (the trial court, the Illinois Appellate Court, and the Illinois Supreme Court). *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). Thus, the court must determine if Moedano raised his remaining claims before the trial court, the Illinois Appellate Court, and the Illinois Supreme Court. *See Castille v. Peoples*, 489 U.S. 346, 349 (1989) (failure to present claim to state intermediate court means that it is procedurally barred); *O'Sullivan*, 526 U.S. at 844 (failure to present claim to state's highest court means it is procedurally barred).

A study of Moedano's counseled PLA for his direct appeal demonstrates that he did not raise his remaining three arguments – Claims 3(a) (ineffective assistance of trial counsel based on the failure to investigate the effect that Xanax had on R.T.) and 4(a) and (b) (alleged violation of due process based on the trial court's statements about R.T.'s modest pajamas and her "loss of control") – in his counseled direct appeal PLA. Thus, these claims are procedurally defaulted under the one full round doctrine. *See O'Sullivan*, 526 U.S. at 844.

The court also notes that Moedano did not seek file a state post-conviction petition so no state collateral proceedings exist to excuse the default of Claims 3(a), 4(a), and 4(b). Moedano raised defaulted Claim 3(a) in his motion for a new trial. This claim is clearly without merit given the state court's finding that Moedano's purported belief that R.T. consented was

unreasonable because, for among other reasons, R.T. was unconscious when Moedano penetrated her twice. For purposes of federal habeas review, this court must accept this factual determination.

In any event, even if Moedano's speculation that Xanax affected R.T.'s condition to some degree is correct (an issue which the court expressly declines to consider), the key fact is that she was unconscious at critical points in the evening. Whether Xanax contributed to her inability to maintain consciousness is irrelevant to whether Moedano could have reasonably believed that an unconscious person could consent to sexual activity. Thus, any failure of trial counsel to consider the impact of Xanax would not violate the Sixth Amendment. *See Oliver v. Pfister*, No. 13 C 426, 2013 WL 3177882, at *14 (N.D. Ill. June 20, 2013) (holding that the failure to raise a doomed argument is not ineffective assistance of counsel).

With respect to Claims 4(a) and 4(b), although Moedano did not include these claims in his direct appeal PLA, he raised them before the Illinois Appellate Court, which considered and rejected them. He could not have raised Claims 4(a) and 4(b) in a state post-conviction petition because they are based on the trial court record. This means that with or without the assistance of counsel during state collateral proceedings, Moedano could not have avoided procedural default of these claims by filing a state post-conviction petition. *See*, *e.g.*, *People v. Harris*, 224 Ill.2d 115, 124 (2007) ("The scope of the [state post-conviction] proceeding is limited to constitutional matters that have not been, nor could have been, previously adjudicated.").

Because the court has determined that Claims 3(a), 4(a), and 4(b) are procedurally defaulted, it turns to whether the exceptions to procedural default apply. There are two exceptions to procedural default that, if met, allow a federal habeas court to reach the merits of a

defaulted claim. First, the "cause and prejudice" exception applies if a petitioner identifies an "objective factor external to the defense [that] impeded [his] efforts to comply with the State's procedural rule" and demonstrates actual prejudice resulting from the alleged violation of federal law. *Strickler v. Greene*, 527 U.S. 263, 282 n.24 (1999). Alternatively, a petitioner can avoid default using the "fundamental miscarriage of justice" exception, which applies in "situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent." *Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Moedano does not contend that either exception applies. Nothing in the record before the court indicates that an objective factor prevented Moedano from raising his defaulted claims properly. Thus, he cannot establish cause that excuses his defaults. As he cannot do so, the court need not address the prejudice prong. *See Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir. 2010).

The court next turns to the fundamental miscarriage of justice exception, which applies in "situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent." *Dellinger*, 301 F.3d at 767 (citing *Schlup*, 513 U.S. at 327 ). To show "actual innocence," a petitioner must present clear and convincing evidence that, but for the alleged constitutional error, no reasonable juror would have convicted him. *Id.* To satisfy this demanding standard, Moedano "must support the innocence claim with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Morales v. Johnson*, 659 F.3d 588, 606 (7th

Cir. 2011) (internal quotations omitted).  Moedano has not pointed to any new evidence showing that he is actually innocent.  Thus, this exception to procedural default is inapplicable.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, which provides that the district court must issue or deny a certificate of appealability when it enters "a final order adverse to the applicant," the court turns to whether a certificate of appealability should issue. Under 28 U.S.C. § 2253(c)(2), "(1) [a] certificate of appealability may be issued only if the prisoner has at least one substantial constitutional question for appeal; (2)[t]he certificate must identify each substantial constitutional question; (3)[i]f there is a substantial constitutional issue, and an antecedent non-constitutional issue independently is substantial, then the certificate may include that issue as well; (4)[a]ny substantial non-constitutional issue must be identified specifically in the certificate; [and] (5)[i]f success on a non-constitutional issue is essential (compliance with the statute of limitations is a good example), and there is no substantial argument that the district judge erred in resolving the non-constitutional question, then no certificate of appealability should issue even if the constitutional question standing alone would have justified an appeal." *Davis v. Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003).

For the reasons stated in this order, the court finds that Moedano has not made a substantial showing of the denial of a constitutional right as he has not demonstrated "that reasonable jurists could debate whether the challenges in his habeas petition should have been resolved differently or that his petition adequately shows a sufficient chance of the denial of a constitutional rights that he deserves encouragement to proceed further." *See Rutledge v. United*

*States*, 230 F.3d 1041, 1047 (7th Cir. 2000). Accordingly, the court declines to issue a certificate of appealability.

## V. CONCLUSION

For the above reasons, Miguel Moedano's request for a writ of habeas corpus under 28 U.S.C. § 2254 is denied. The court declines to certify any issues for appeal under 28 U.S.C. § 2253(c). The clerk is directed to substitute Darryl Edwards, the Warden of the Taylorville Correctional Center, as the respondent. The clerk is further directed to enter a Rule 58 judgment and terminate this case.

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 30, 2014